HILARY POTASHNER (Bar No. 167060)
Federal Public Defender
AMY M. KARLIN (Bar No. 150016)
(E-Mail:  Amy_Karlin@fd.org)
ISABEL BUSSARAKUM (Bar No. 295046)
(E-Mail:  Isabel_Bussarakum@fd.org)
Deputy Federal Public Defenders
411 West Fourth Street, Suite 7110
Santa Ana, California  92701-4598
Telephone:  (714) 338-4500
Facsimile:  (714) 338-4520

Attorneys for Defendant
MARK WHITEHEAD

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# SOUTHERN DIVISION

| UNITED STATES OF AMERICA, | Case No. SA CR 17-154-JLS |
|---|---|
| Plaintiff, | |
| v. | **DEFENDANT MARK WHITEHEAD'S SENTENCING POSITION** |
| MARK WHITEHEAD, | |
| Defendant. | **Date:** April 6. 2018<br>**Time:** 9:30 a.m.<br>**Courtroom:** 9B |

Defendant Mark Whitehead, through his counsel of record, Deputy Federal Public Defenders Amy M. Karlin and Isabel Bussarakum, hereby files this memorandum setting forth his sentencing position.

Respectfully submitted,

HILARY POTASHNER
Federal Public Defender

DATED:  March 23, 2018     By  */s/ Isabel Bussarakum*

ISABEL BUSSARAKUM
Deputy Federal Public Defender
Attorney for MARK WHITEHEAD

1

# TABLE OF CONTENTS

**PAGE**

I. INTRODUCTION ...................................................................................................... 2

II. OBJECTIONS TO THE PSR ................................................................................... 3

    A.    Paragraphs 3-15 (The Offense Conduct) ........................................... 3

    B.    Paragraph 17 (Defendant's Statement) .............................................. 3

    C.    Paragraph 28 (Personal Data) ........................................................... 3

    D.    Paragraph 30 (Personal Data) ........................................................... 3

    E.    Paragraph 35 (Personal Data) ........................................................... 3

    F.    Paragraph 43 (Education and Vocational Skills) ............................. 3

    G.    Paragraph 48 (Financial Condition) .................................................. 3

III. FACTUAL BACKGROUND ................................................................................. 4

IV. THE GOVERNMENT'S POSITION IS INCORRECT ......................................... 6

    A.    Imposing the Fraud Guideline Would Be Error ............................... 6

    B.    Applying the Fraud Guidelines Based on Conduct Not Found by a Jury Beyond a Reasonable Doubt Violates *Apprendi* ....................... 8

    C.    The Civil Case and the Bankruptcy Filings Are Not Relevant Conduct ..... 9

V. THE SENTENCING GUIDELINES ...................................................................... 10

    A.    Obstruction of Justice Is the Most Analogous Guideline .............. 10

    B.    The Statutory Maximum Is One Year ............................................ 12

    C.    Base Offense Level and Specific Offense Characteristics ............. 13

    D.    No Chapter 3 Adjustments Apply ................................................... 13

    E.    Criminal History Category .............................................................. 14

    F.    The Guidelines Range Is 15-21 Months ........................................ 14

    G.    A Downward Departure Is Warranted to Accomplish the Sentencing Commission's Goals .................................................... 14

VI. SECTION 3553(A) FACTORS ............................................................................ 15

    A.    Nature and Circumstances of the Offense ..................................... 16

    B.    Mr. Whitehead's History and Characteristics ............................... 17

    C.    Seriousness of the Offense, Respect for Law, Just Punishment ... 19

i

1

**TABLE OF CONTENTS (CONT'D)**

2

     D.     Deterrence ................................................................................... 19

3

     E.     Need to Protect the Public ............................................................ 20

4

     F.     Rehabilitation ............................................................................... 20

5

VII. CONCLUSION ................................................................................... 21

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**PAGE(S)**

*Apprendi v. New Jersey,*
    530 U.S. 466 (2000) ................................................................................... 8, 9

*Bingman v. Ward,*
    100 F.3 (9th Cir. 1996) ................................................................................. 15

*Blakely v. Washington,*
    542 U.S. 296 (2004) ......................................................................................... 9

*Chef v. Schnackenberg,*
    384 U.S. 373 (1966) ....................................................................................... 14

*Frank v. United States,*
    395 U.S. 147 (1965) ....................................................................................... 15

*Hoffman v. International Longshoremen's and Warehousemen's Union, Local Number 10,*
    492 F.2d 929 (9th Cir. 1974) ......................................................................... 15

*Jones v. United States,*
    526 U.S. 227 (1999) ..................................................................................... 8, 9

*Kimbrough v. United States,*
    552 U.S. 85 (2007) ......................................................................................... 15

*United States v. Booker,*
    543 U.S. 220 (2005) ....................................................................................... 12

*United States v. Broussard,*
    611 F.3d 1069 (9th Cir. 2010) ............................................................... 2, 12, 13

*United States v. Carpenter,*
    91 F.3d 1282 (9th Cir. 1996) ......................................................................... 12

*United States v. Dohrmann,*
    103 F.3d 141 (9th Cir. 1996) ........................................................................... 7

# TABLE OF AUTHORITIES (CONT'D)

**PAGE(S)**

*United States v. Ferrara,*
    334 F.3d 774 (8th Cir. 2003) ................................................................. 7

*United States v. Gaudin,*
    515 U.S. 506 (1995) ............................................................................ 9

*United States v. Lohan,*
    945 F.2d 1214 (2d Cir. 1991) ............................................................... 8

*United States v. McEnry,*
    659 F.3d 893 (9th Cir. 2011) .......................................................... 2, 6, 11

*United States v. Ochoa,*
    311 F.3d 1133 (9th Cir. 2002) ............................................................. 10

*United States v. Powers,*
    629 F.2d 619 (9th Cir. 1980) ............................................................... 14

*United States v. Rylander,*
    714 F.2d 996 (9th Cir. 1983) ............................................................... 14

*United States v. Vale,*
    No. 06-0942-CR, 2007 WL 2914272 (2d Cir. Oct. 5, 2007) ................................ 8

## DOCKETED CASES

*United States v. Arpaio,*
    ECF No. 83, Case No. 2:16-cr-1012-SRB (D. Ariz. Aug. 19, 2016) ................. 15

## FEDERAL STATUTES AND SENTENCING GUIDELINES

18 U.S.C. § 401 ................................................................................ 11, 15

18 U.S.C. § 1509 ................................................................................ *passim*

18 U.S.C. § 3553 ................................................................................ *passim*

18 U.S.C. § 3559(a) ........................................................................... 12

# TABLE OF AUTHORITIES (CONT'D)

**PAGE(S)**

### FEDERAL STATUTES AND SENTENCING GUIDELINES

28 U.S.C. § 994(j) ............................................................................... 19

USSG § 1B1.3 ............................................................................... *passim*

USSG § 2J1.2(a) ............................................................................... 13

### MISCELLANEOUS

U.S. Sentencing Commission, *Measuring Recidivism: The Criminal History
  Computation of the Federal Sentencing Guidelines* (May 2004) ....................... 20

David Weisburd *et al.*, *Specific Deterrence in a Sample of Offenders Convicted
  of White-Collar Crimes*, 33 Criminology 587 (1995) ......................................... 19

Sentencing Comm'n, *Recidivism and the "First Offender"* (May 2004) ..................... 20

J. Bishop, Criminal Procedure § 87 (2d ed. 1872) ............................................. 9

Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1
  (2006) ......................................................................................... 19

# SENTENCING MEMORANDUM

## I. INTRODUCTION

This is a criminal contempt case.  Because there is no specific guideline for criminal contempt, this Court must choose the most analogous guideline.  USSG §§ 2J1.1, 2X5.1.  The Ninth Circuit has clearly established that this Court must select the appropriate guideline based on the crime of conviction—not the relevant conduct, or the risk it creates, or some other consideration outside of the crime of conviction. *United States v. McEnry*, 659 F.3d 893, 897, 899-901 (9th Cir. 2011).  The charged conduct in this case had nothing to do with fraud.  Thus, sentencing Mr. Whitehead under the fraud guideline based on uncharged conduct in the underlying civil case or in an unrelated bankruptcy filing, as the government urges, would be error.

Mr. Whitehead should be sentenced, instead, under the guideline for obstruction of justice.  In particular, the most analogous offense is 18 U.S.C. § 1509, which penalizes the obstruction of court orders by threats or force.  While Mr. Whitehead did not use any threats or force, the crux of his offense is the same as § 1509, which is to interfere with the exercise of rights and the performance of duties under a court order. *Id.*  Under the obstruction of justice guideline, Mr. Whitehead's offense level is 14 and his criminal history category is I, resulting in a guideline range of 15-21 months.  However, under Ninth Circuit case law, the 1-year statutory maximum for 18 U.S.C. § 1509 applies.  *United States v. Broussard*, 611 F.3d 1069, 1072 (9th Cir. 2010).

For the reasons set forth herein, Mr. Whitehead respectfully submits that a sentence of time served (5 months and 10 days), followed by 1 year of supervised release, is reasonable and sufficient to accomplish every goal of sentencing, in light of the guidelines, 18 U.S.C. § 3553, and case law.  In the alternative, if the Court is inclined to impose additional punishment, Mr. Whitehead respectfully submits that further incarceration is unnecessary, and that a sentence of time served followed by 4 months' home detention and 1 year of supervised release would restrict his liberty for

2

an additional period of time and impress upon him the seriousness of the offense.

## II. OBJECTIONS TO THE PSR

Mr. Whitehead makes the following factual objections to the Presentence Investigation Report ("PSR") dated February 23, 2018 (ECF No. 89):

**A.  Paragraphs 3-15 (The Offense Conduct)**

Mr. Whitehead objects to and disputes the description of the offense conduct in Paragraphs 3 through 15 of the PSR, based on the evidence and arguments that he made in both the underlying civil case, *Donald Okada v. Mark Whitehead*, Case No. SA CV 15-1449-JLS (the "Civil Case"), and the criminal contempt case.

**B.  Paragraph 17 (Defendant's Statement)**

Mr. Whitehead objects to Paragraph 17 as an incomplete summary of his July 1, 2017 declaration in the Civil Case.

**C.  Paragraph 28 (Personal Data)**

Mr. Whitehead is not sure of his brother's exact age; he may be 69 years old.

**D.  Paragraph 30 (Personal Data)**

After ending his professional tennis career, Mr. Whitehead also had a real estate business and tennis club in Australia between approximately 1986 and 1999.

**E.  Paragraph 35 (Personal Data)**

In addition to the two Florida addresses listed in Paragraph 35, Mr. Whitehead previously resided in at least two other Florida apartments belonging to his daughters.

**F.  Paragraph 43 (Education and Vocational Skills)**

With regard to his California real estate licenses, Mr. Whitehead first received his salesperson license in approximately 2001, and then earned his broker's license in approximately 2004, as described in Paragraph 44.

**G.  Paragraph 48 (Financial Condition)**

Mr. Whitehead disputes and objects to the debts described in Paragraph 48.

### III. FACTUAL BACKGROUND

Because this Court is well-versed in the Civil Case and the criminal contempt case, there is no reason to provide a full recitation of the facts. Mr. Whitehead, instead, briefly responds to a number of issues that the government got wrong in its brief.

The government states that Mr. Whitehead did not inform the Receiver or Mr. Okada that he was finding a buyer for Lions Gate. (Government's Position at 4.) This is not true. On May 17, 2017, Mr. Whitehead's lawyer in the Civil Case, James Bryant, sent an email to Mr. Okada's lawyers in response to the Receivership Order. (Civil Case, ECF No. 300-3 at 5-6.) At the end of that email, Mr. Bryant stated: "In the interim it has been expressed that Mark needs to find a buyer and he has been making efforts to do so." (*Id.* at 6.) The Receiver was copied on the next email in this chain. (*Id.* at 5.) This email indicates that Mr. Bryant had interpreted the Receivership Oder as permitting Mr. Whitehead to help find a buyer for Lions Gate, that he had directed Mr. Whitehead to do so, and that he disclosed all of this to Mr. Okada's lawyers.

The government also asserts that on May 17, 2017—"the same day defendant later admitted in testimony and declarations that he learned of the Receivership Order"—Mr. Whitehead extended the expiration date of the MLS listing for Lions Gate. (Government's Position at 4.) The government omits, however, that on that same day, May 17, 2017, Mr. Bryant had stated in an email that he had told Mr. Whitehead to help find a buyer for Lions Gate. Thus, everything in the record points to the fact that Mr. Whitehead was told by his lawyer on May 17, 2017 to find a buyer, and that he did not know that doing so was a violation of the Receivership Order.

The government also states that after Mr. Okada filed his application for contempt on May 25, 2017, Mr. Whitehead continued to advertise Lions Gate for sale in Facebook posts dated June 1, 2017 and June 15, 2017, did not say anything about these advertisements in his July 1, 2017 declaration filed in response to the contempt application, and lowered the property's list price on July 6, 2017. (Government's Position at 4-5.) But as just explained, Mr. Whitehead did not know that advertising

4

Lions Gate for sale was a violation of the Receivership Order, and Mr. Okada did not make that argument until he filed the reply brief to his application for contempt on July 13, 2017.  (ECF No. 322.)  So Mr. Whitehead would not have known to stop advertising Lions Gate for sale until July 13, 2017 at the earliest, or that he needed to address the advertising efforts in his earlier-filed declaration.

The government also claims that Mr. Whitehead has prevented the Receiver from carrying out his duties by appealing the domestication of the Receivership Order in the Dominican Republic.  (Government's Position at 5.)  But Mr. Whitehead was incarcerated here in the Santa Ana Jail when the domestication was appealed, and the government has not shown that Mr. Whitehead ordered or authorized the appeal. Additionally, when Mr. Whitehead learned that the domestication order had been appealed, he asked his lawyer in the Dominican Republic to stop the appeal process.

The government also argues that Mr. Whitehead has frustrated the Receivership Order by filing for bankruptcy in bad faith, and that he made false statements in his bankruptcy filings.  (Government's Position at 5-10.)  However, Mr. Whitehead did not file for bankruptcy in bad faith, and did not intend to mislead the Bankruptcy Court in any way.  Indeed, on March 9, 2018, the U.S. Bankruptcy Court for the Southern District of Florida denied Mr. Okada's motions to dismiss Mr. Whitehead's bankruptcy filing for bad faith or failure to meet the eligibility requirements.  *See In re Mark John Whitehead*, ECF Nos. 27, 61, 71, Case No. 17-24386-RAM (Bankr. S. D. Fla. Nov. 30, 2017).  Mr. Okada raised many of the same issues that the government is raising now, and those arguments were dismissed by the Bankruptcy Court, which has permitted Mr. Whitehead to proceed with his bankruptcy.

As explained by Mr. Whitehead's bankruptcy lawyer, Rodolfo De La Guardia, he filed a "skeletal or bare pones petition" based on a credit report because Mr. Whitehead was incarcerated in this case, which made it difficult to obtain all of the necessary

5

information.  (Ex. A[1] at 1, 2.)  The Bankruptcy Code permits filing a skeletal petition, as well as extensions of time and amendments to correct errors and omissions.  (*Id.*) While there may have been some mistakes in Mr. Whitehead's filings, they were not made in bad faith and are in the process of being corrected.  (*Id.* at 2.)  Indeed, some of the mistakes are not even in Mr. Whitehead's favor (*e.g.*, that Mr. Whitehead had lived in a community property state), further demonstrating that there was no bad faith or fraudulent intent.

### IV. THE GOVERNMENT'S POSITION IS INCORRECT

### A.    Imposing the Fraud Guideline Would Be Error

The government's position that the fraud guideline should apply runs directly contrary to Ninth Circuit case law establishing that the Court must select a guideline based on the charged conduct, as opposed to the underlying relevant conduct.  *McEnry*, 659 F.3d at 899-901 (reversing the district court's guideline choice because it was based "not on the elements of the offense or the facts alleged in the indictment, but on the defendant's particular relevant conduct and the risk it created"); *see also infra* Section V.A.  Mr. Whitehead was charged with four acts of contempt:  (1) advertising Lions Gate for sale, (2) denying the Receiver access to Lions Gate on May 2, 2017, (3) failing to turn over www.LionsGateMansion.com, and (4) failing to turn over bank statements.  (ECF No. 1.)  While we do not know which of these acts he was convicted of,[2] none of them involved any misrepresentation, deceit, or fraud.  (ECF No. 69.)

The government's argument to apply the fraud guideline relies *not* on the actual acts of contempt, but on the finding of fraud in the underlying Civil Case.  The

---

[1] Pages 1 through 3 of Exhibit A is a letter by Mr. Whitehead's bankruptcy lawyer.  Originally attached to the letter were filings in the bankruptcy proceeding. Some of those attachments were submitted to this Court as exhibits to the government's filings or in the Civil Case, and the remaining attachments are available on PACER. Accordingly, the attachments were omitted from Exhibit A in the interest of economy.

[2] In general, this brief will address the charged acts of contempt, since we do not know which of those acts Mr. Whitehead was convicted of.

6

government's position is that because the Court issued the Receivership Order to remedy the fraud in the underlying Civil Case, Mr. Whitehead's violations of the Receivership Order constituted further fraud.  (Government's Position at 13-14.)

There are, however, numerous problems with the government's position:

*First*, the underlying finding of fraud in the Civil Case is completely unrelated to the four alleged acts of contempt.  As summarized in the Findings of Fact and Conclusions of Law, the jury in the Civil Case found that Mr. Whitehead "concealed his rental income property from Ocean Ridge and made false statements about the ability to place a lien on Lions Gate before the SHR Solar Companies were updated." (Civil Case, ECF No. 270, ¶ 58.)  These very specific findings address conduct that occurred years prior to the contempt.  That conduct has nothing to do with any of the four charged acts of contempt.

*Second*, the underlying finding of fraud was made under a preponderance of the evidence standard, and falls far short of the standard of proof beyond a reasonable doubt that applies in the criminal case.  In the criminal contempt case, there was no instruction on fraud, or jury finding of fraud.

*Third*, it is an overstatement to say that the Receivership Order was issued to remedy fraud.  Whether there was fraudulent conduct was only one factor in a seven-factor test that the Court applied to determine whether to appoint a receiver.  (ECF No. 270, ¶¶ 57-58.)

*Fourth*, to the extent that the Receivership Order was intended, in part, to remedy fraud, that does not transform every violation of the Receivership Order into fraud.

Indeed, none of the alleged acts of contempt involved any fraud.  This is in stark contrast to the few cases where the fraud guideline has been applied to contempt convictions.  In each of those cases, the act of contempt itself involved or constituted fraud.  *See, e.g.*, *United States v. Dohrmann*, 103 F.3d 141 (9th Cir. 1996) (applying fraud guideline where defendant willfully disobeyed injunction prohibiting the violation of anti-fraud provisions of federal securities laws, by selling debentures to

7

approximately 233 investors based on fraudulent statements); *United States v. Ferrara*, 334 F.3d 774 (8th Cir. 2003) (applying fraud guideline where defendant violated consent judgment requiring him to comply with franchise disclosure regulations, by making false representations to encourage the sale of franchises to more than 150 people, all of whom lost money and none of whom received a return of their investment pursuant to a supposed money-back guarantee); *United States v. Lohan*, 945 F.2d 1214, 1218 (2d Cir. 1991) (applying fraud guidelines where defendant violated injunction prohibiting him from "[c]heating or defrauding, or attempting to cheat or defraud, any person" in connection with commodities futures transaction, by changing his name and starting a new company that solicited potential investors based on fraud and deceit); *United States v. Vale*, No. 06-0942-CR, 2007 WL 2914272, at *1 (2d Cir. Oct. 5, 2007) (affirming application of fraud guideline where defendant "went to considerable lengths—utilizing shell corporations, out-of-state mail drops, and toll free numbers—to conceal his knowing and deliberate violations of court orders from the district court, the Food and Drug Administration, and his customers," and where defendant "persisted in making false and extravagant claims about [a product's] ability to cure cancer").

Unlike the conduct in each of the above cases, the charged acts of contempt here did not involve any fraud, and thus, are categorically distinct. Accordingly, it would be error to sentence Mr. Whitehead under the fraud guideline.

## B. Applying the Fraud Guidelines Based on Conduct Not Found by a Jury Beyond a Reasonable Doubt Violates *Apprendi*

Moreover, because applying the fraud guideline would increase the maximum penalty based on facts not found beyond a reasonable doubt by a jury, doing so also violates the Fifth and Sixth Amendments.

"[U]nder the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt."

8

*Apprendi v. New Jersey*, 530 U.S. 466, 476 (2000) (quoting *Jones v. United States*, 526 U.S. 227, 243 n.6 (1999)).  "[T]hese rights indisputably entitle a criminal defendant to 'a jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt."  *Id.* at 477 (quoting *United States v. Gaudin*, 515 U.S. 506, 510 (1995)).

"[T]he 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*."  *Blakely v. Washington*, 542 U.S. 296, 303 (2004) (emphasis in original).  "In other words, the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum [s]he may impose *without* any additional findings."  *Id.* at 303-04 (emphasis in original).  Here, the maximum sentence based solely on the facts reflected in the criminal verdict is the one-year statutory maximum that applies to 18 U.S.C. § 1509 for obstruction of court orders.  *See infra* Section V.B.

However, "[w]hen a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts 'which the law makes essential to the punishment,' and the judge exceeds h[er] proper authority."  *Blakely*, 542 U.S. at 304 (quoting 1 J. Bishop, Criminal Procedure § 87, p.55 (2d ed. 1872)).  Applying the fraud guideline here based on uncharged conduct from the underlying Civil Case and/or the bankruptcy filing would increase Mr. Whitehead's sentence beyond the one-year statutory maximum that should apply based on conduct that has not been found by a jury, thereby exceeding the Court's authority under the Fifth and Sixth Amendments.

**C.    The Civil Case and the Bankruptcy Filings Are Not Relevant Conduct**

The government focuses primarily on the Civil Case and Mr. Whitehead's bankruptcy case.  But Mr. Whitehead was not charged with or tried for these acts.  They are irrelevant, and thus not even considered relevant conduct under the sentencing guidelines.

9

USSG § 1B1.3 authorizes adjustments to the base offense level for conduct that was "part of the same course of conduct or common scheme or plan as the offense of conviction."  USSG § 1B1.3(a)(2).  There is no evidence of a "common scheme or plan" tying the alleged acts of contempt to either the conduct underlying the Civil Case, or the bankruptcy filing.  As demonstrated below in Section VI.A, there were a number of issues beyond Mr. Whitehead's control that contributed to his contempt, which further illustrates that the contempt was not part of some common scheme or plan, but rather, the result of a series of unfortunate events.

Moreover, to the extent that the Court considers the Civil Case and the bankruptcy filing relevant conduct, that cannot be used to impose a sentence that exceeds the one-year statutory maximum imported from 18 U.S.C. § 1509.  *See infra* Section V.B.  "United States Sentencing Guideline § 5G1.1(c) provides that sentencing courts may not apply sentence enhancement provisions such as § 1B1.3 so as to raise the defendant's sentence beyond the statutory maximum for the underlying offense."  *United States v. Ochoa*, 311 F.3d 1133, 1136 (9th Cir. 2002).

## V. THE SENTENCING GUIDELINES

### A.    Obstruction of Justice Is the Most Analogous Guideline

The United States Sentencing Commission has declined to provide a specific guideline for criminal contempt.  The Commission explains:

> Because misconduct constituting contempt varies significantly and the nature of the contemptuous conduct, the circumstances under which the contempt was committed, the effect the misconduct had on the administration of justice, and the need to vindicate the authority of the court are highly context-dependent, the Commission has not provided a specific guideline for this offense.

USSG § 2J1.1, comment 1.  The contempt guideline, Section 2J1.1, directs us to "[a]pply §2X5.1," which, in turn, states:  "If the offense is a felony for which no

10

1  guideline expressly has been promulgated, apply the most analogous offense

2  guideline." USSG § 2X5.1.

3        With regard to applying Section 2X5.1, the Ninth Circuit has "emphasized that it

4  is not the defendant's underlying relevant conduct, but *the crime of conviction*, that

5  governs the selection of the appropriate guideline section." *McEnry*, 659 F.3d at 900-

6  01 (emphasis added). "[A] district court may not use relevant conduct to select

7  whatever guideline it wants; relevant conduct may be considered only in the application

8  of enhancements and adjustments once a guideline has been selected." *Id.* According

9  to the principles embodied in the guidelines, "the selection of a guideline is primarily a

10  statutory question, and to the extent the court is required to look to the facts to select a

11  guideline, *the court is limited to the conduct charged* in the indictment." *Id.* at 899

12  (emphasis added). "These principles necessarily govern the selection of a guideline

13  under § 2X5.1." *Id.*

14        Mr. Whitehead was charged with, tried for, and convicted of criminal contempt

15  in violation of 18 U.S.C. § 401, which punishes disobedience of a lawful order. (ECF

16  Nos. 1, 69.) The elements of criminal contempt are that the defendant knew of and

17  willfully disobeyed a clear and definite court order. (ECF no. 68 at 33.)

18        Focusing on the offense that Mr. Whitehead was charged with and convicted

19  of—contempt—the most analogous guideline is that for the obstruction of justice.

20  USSG § 2J1.2. Indeed, the contempt guideline (§ 2J1.1) and the obstruction of justice

21  guideline (§ 2J1.2) are grouped together, with the latter directly following the former,

22  in Chapter 2, Part J, which deals with "Offenses Involving the Administration of

23  Justice." The contempt guideline, moreover, explicitly contemplates that the

24  obstruction of justice guideline will be "sufficiently analogous" in "certain cases."

25  USSG § 2J1.1, comment 1.

26        This is one such case. Indeed, one of the statutes covered by the obstruction of

27  justice guideline, 18 U.S.C. § 1509, is strikingly similar to the charged offense, and

28

11

punishes the same type of behavior as contempt with one difference.  Section 1509 is titled, "Obstruction of court orders," and states as follows:

> Whoever, by threats or force, willfully prevents, obstructs, impedes, or interferes with, or willfully attempts to prevent, obstruct, impede, or interfere with, the due exercise of rights or the performance of duties under any order, judgment, or decree of a court of the United States, shall be fined under this title or imprisoned not more than one year, or both.

18 U.S.C. § 1509.

While Mr. Whitehead did not use any "threats or force," the crux of his offense is the same as 18 U.S.C. § 1509.  Section 1509 punishes "willfully . . . interfer[ing] with . . . the due exercise of rights or the performance of duties under any order."  *Id.* According to the charging document in this case, Mr. Whitehead interfered with the Receiver's rights and duties under the Receivership Order, and failed to perform some of his own duties under the same Order.  (ECF No. 1.)  Given the similarity between Mr. Whitehead's offense and 18 U.S.C. § 1509, Mr. Whitehead should be sentenced under the obstruction of justice guideline, USSG § 2J1.2.

## B.    The Statutory Maximum Is One Year

Under Ninth Circuit case law, the statutory maximum of the analogous offense is applied to the contempt offense.  *Broussard*, 611 F.3d at 1072.  In *Broussard*, the Ninth Circuit explained that "[t]he severity of contempt violations for purposes of 18 U.S.C. § 3559(a) turns on the most analogous underlying offense."  *Id.*  Accordingly, "criminal contempt should be classified for sentencing purposes according to the applicable Guidelines range for the most nearly analogous offense."  *Id.* (quoting *United States v. Carpenter*, 91 F.3d 1282, 1285 (9th Cir. 1996)).  Under prior Ninth Circuit precedent, the guidelines sentencing range for the analogous offense set the maximum sentence that the judge was authorized to impose for contempt.  *Carpenter*, 91 F.3d at 1285. However, after *United States v. Booker*, 543 U.S. 220 (2005) made the guidelines advisory, the Ninth Circuit revised *Carpenter* such that the statutory maximum of the

12

1  analogous offense now sets "the upper limit of the district judge's discretion" in

2  imposing a sentence for contempt.  *Broussard*, 611 F.3d at 1072.

3       Here, the statutory maximum for 18 U.S.C § 1509 is 1 year in prison, and thus,

4  Mr. Whitehead cannot be sentenced to more than that.

5  **C.   Base Offense Level and Specific Offense Characteristics**

6       Turning to the obstruction of justice guideline, the base offense level is 14,

7  USSG § 2J1.2(a), and none of the specific offense characteristics under § 2J1.2 apply.

8  **D.   No Chapter 3 Adjustments Apply**

9       Likewise, none of the adjustments from Chapter Three apply.  The only

10  adjustment that the government seeks to apply is a +2 increase for obstructing or

11  impeding the administration of justice under USSG § 3C1.1.  (Government's

12  Sentencing Position at 16-19.)  However, applying § 3C1.1 would amount to double

13  counting because Mr. Whitehead's offense *is* obstruction of justice.  As the government

14  acknowledges, § 3C1.1 should not be applied to offenses covered by the contempt

15  guideline, § 2J1.1, or the obstruction of justice guideline, § 2J1.2, unless "a significant

16  further obstruction occurred during the investigation, prosecution, or sentencing of the

17  obstruction offense itself."  USSG § 3C1.1, Application Note 7.

18       In other words, § 3C1.1 applies to obstruction *of the obstruction case*.  The

19  example provided by Application Note 7 is that "the defendant threatened a witness

20  *during the course* of the prosecution for the obstruction offense."  USSG § 3C1.1,

21  Application Note 7 (emphasis added).  Nothing like that occurred in Mr. Whitehead's

22  contempt case.  Neither Mr. Whitehead's July 1, 2017 declaration, nor his bankruptcy

23  filing, obstructed his criminal contempt case.  Indeed, this Court has noted that Mr.

24  Whitehead's declaration effectively admitted the violations of this Court's orders,

25  which is the opposite of obstruction.  (*See* Ex. B, 16:5-8 ("His own declaration and

26  documentary evidence has already been adduced to show a violation and the intentional

27  nature of the violation.").)  Moreover, Mr. Whitehead's bankruptcy has not interfered in

28  any way with his prosecution for criminal contempt.  Thus, the government's attempt to

13

apply § 3C1.1 based on Mr. Whitehead's declaration and bankruptcy proceeding misses the mark.  Thus, § 3C1.1 does not apply, and Mr. Whitehead's total offense level is 14.

**E.     Criminal History Category**

Mr. Whitehead has no prior criminal convictions.  (PSR, ¶ 19.)  He is a true first-time offender with 0 criminal history points, and a criminal history category of I.

**F.     The Guidelines Range Is 15-21 Months**

The resulting guidelines range for offense level 14 and criminal history category I is 15-21 months.  However, as noted above, the upper limit of the Court's discretion is tied to the 1-year statutory maximum for 18 U.S.C. § 1509.

**G.     A Downward Departure Is Warranted to Accomplish the Sentencing Commission's Goals**

In addition to the fact that a 1-year statutory maximum applies here, departing below the guidelines is warranted to realize the Sentencing Commission's goals of achieving:  (1) "reasonable uniformity in sentencing by narrowing the wide disparity in sentences imposed for similar criminal offenses committed by similar offenders," and (2) "proportionality in sentencing through a system that imposes appropriately different sentences for criminal conduct of differing severity."  USSG, Ch. 1, Pt. A, § 3.

First, with regard to reasonable uniformity, the requested sentence of time served (5 months and 10 days) is in line with other cases involving violations of court orders, and, in fact, relatively strict when compared to the sentences constituting only fines or suspended sentences.  *See, e.g.*, *Chef v. Schnackenberg*, 384 U.S. 373 (1966) (former company president and chairman sentenced to 6 months' imprisonment, and two other officers fined $500 each, for criminal contempt of Court of Appeals order directing compliance with the Federal Trade Commission's cease-and-desist order prohibiting the company and its officers from continuing to engage in illegal practices); *United States v. Rylander*, 714 F.2d 996 (9th Cir. 1983) (district court had imposed 6 months' imprisonment for disobeying court's order to produce summoned documents, though conviction was reversed for insufficient evidence); *United States v. Powers*, 629 F.2d

14

619 (9th Cir. 1980) (90-day sentence for refusing to testify in violation of court's order); *Frank v. United States*, 395 U.S. 147 (1965) (suspended sentence of 5 years' probation for violating injunction restraining defendant from using interstate facilities in the sale of certain oil interests without having filed registration statement with the SEC); *Bingman v. Ward*, 100 F.3 653 (9th Cir. 1996) (fines of $1,450 and $500 imposed on prison officials for failing to comply with preliminary injunction regarding dental services to prisoner); *Hoffman v. Int'l Longshoremen's and Warehousemen's Union, Local No. 10*, 492 F.2d 929 (9th Cir. 1974) (fine of $25,000 for each of three unions, with remission of $15,000 of each fine, and suspended sentence of 1-year probation for individual defendants, for violations of labor injunctions); *see also United States v. Arpaio*, ECF No. 83, Case No. 2:16-cr-1012-SRB (D. Ariz. Aug. 19, 2016) (setting six-month maximum sentence for criminal contempt charge under 18 U.S.C. § 401 for violating an injunction ordering Maricopa County Sheriff Joe Arpaio and his deputies from racially profiling Latino drivers).

Second, departing below the guidelines range of 15-21 months also satisfies the goal of sentencing defendants in proportion to the severity of their offenses. While 18 U.S.C. § 1509 is the most analogous offense, it is not identical to Mr. Whitehead's offense. Because § 1509 requires the use of "threats or force," there is a strong argument that it is a more serious offense than Mr. Whitehead's offense, which did not include any threats or force. Under the principle of proportionality, Mr. Whitehead should not receive the maximum sentence for someone who used force or threats. Thus, imposing a sentence of time served (5 months and 10 days) would create a measure of proportionality to the statutory scheme for obstruction of court orders.

### VI. SECTION 3553(a) FACTORS

The "overarching provision" of 18 U.S.C. § 3553(a) is "to 'impose a sentence sufficient, but not greater than necessary,' to accomplish the sentencing goals advanced in § 3553(a)(2)." *Kimbrough v. United States*, 552 U.S. 85, 111 (2007). As a first-time offender—who has no prior criminal history, has not spent a day in jail before this case,

and lacks even the suggestion of violent tendency or substance abuse—a sentence of 5 months and 10 days, or time served, is sufficient to accomplish every sentencing goal.

## A.    Nature and Circumstances of the Offense

The nature and circumstances of Mr. Whitehead's offense support the requested sentence. *See* 18 U.S.C. § 3553(a)(1).  As demonstrated by the evidence at trial, and the record in both the Civil Case and the criminal contempt case, there were a number of factors that played a role in Mr. Whitehead's contempt and mitigated his culpability.

*First*, Mr. Whitehead's former counsel in the civil case, James Bryant, dropped the ball in many ways, which contributed to Mr. Whitehead's contempt.  He did not notify Mr. Whitehead about the Receivership Order when it was issued, or explain its requirements to him.  He was not available to counsel Mr. Whitehead when the Receiver showed up unannounced at Lions Gate on May 2, 2017.  Indeed, all of the evidence indicates that Mr. Bryant was absent until May 17, 2017, a full month after the Receivership Order was issued.  Moreover, even after Mr. Bryant emerged, it appears that his relationship with Mr. Whitehead broke down relatively soon thereafter. As is evidenced in the record of the Civil Case, Mr. Bryant failed to respond to post-judgment discovery requests, failed to oppose Mr. Okada's motion to compel post-judgment discovery, and failed to appear at the hearing on that motion despite a Minute Order (Magistrate Judge Karen Scott) stating that he was expected to appear.

*Second*, as the Receiver, A. Kyle Everett, testified at trial, it was Mr. Whitehead's lawyer in the Dominican Republic, Fernan Ramos, who denied him access to Lions Gate on May 2, 2017.

*Third*, Mr. Whitehead had turned over the Tax Sux bank statement to Charles Krolikowksi in the separate *Newmeyer* action on April 13, 2017 just before he was required to do so in the Civil Case.  This indicates that Mr. Whitehead not trying to hide those bank statements from anyone, but that other issues may have intervened in their belated production in the Civil Case.

16

*Fourth*, as explained in Section III, it appears that Mr. Bryant told Mr. Whitehead to find a buyer for Lions Gate, and that was disclosed to Mr. Okada's lawyers.  (Civil Case, ECF No. 300-3 at 6.)

These circumstances demonstrate that there were a number of confounding factors that played a role in Mr. Whitehead's contempt and mitigated his culpability.

**B.   Mr. Whitehead's History and Characteristics**

Mr. Whitehead is a 66-year old real estate broker, husband of 30 years, and father of two daughters—who has no prior criminal history.  The PSR and the letters of support demonstrate that up until the Civil Case, he has been a law-abiding and productive member of society.  Growing up in Australia, he excelled at sports from a young age.  (PSR, ¶ 30.)  He did well enough to compete around the world professionally—first in equestrian sports, and then in tennis.  (*Id.*)  After aging out of professional sports, he began working in the real estate industry in Australia in approximately 1986.  (*See supra* Section II.D.)  In 1988, he married an American, Annette Whitehead, whom he met on the professional tennis tour.  (PSR, ¶¶ 30-31.)  In 1999, they moved from Australia to California where his wife grew up.  (PSR, ¶ 34.)  In the United States, Mr. Whitehead continued working in the real estate business.  (PSR, ¶¶ 43-45.)  And in 2005, he became a United States citizen.  (PSR, ¶ 33.)

A number of friends, family members, and business associates have also submitted letters of support attesting to Mr. Whitehead's good character.  They, for example, describe Mr. Whitehead as a knowledgeable, honest, and trustworthy real estate broker.  (*See* Ex. A at 8 ("We referred colleagues to [Mr. Whitehead]," and "[e]veryone [Mr. Whitehead] spoke with felt that he knew his business well and that he was a man they could trust to do business with."); Ex. A at 7 ("I have found him to be a man of the highest efficacy, trustworthiness, and an incredible work ethic."); Ex. A at 9 (describing a transaction with Mr. Whitehead as being "held with professionalism and honesty"); Ex. A at 5 ("I've found Mr. Whitehead to be a loyal and trusting person with his dealings with people.").)

17

In addition to providing excellent service to his clients, Mr. Whitehead has gone beyond that to serve as a mentor to many others both on a professional and personal level.  (*See* Ex. A at 6 (Mr. Whitehead's "character has shone through with his willingness to always help people in need and, with regards to business, share his wealth of knowledge and expertise to anyone who asked for it."); Ex. A at 5 (Mr. Whitehead not only "offered valuable [r]eal [e]state opportunities" to Mr. Hourigan, an agent who worked with him for 11 years, but also "personal support during a time of personal loss."); Ex. A at 4 (Mr. Whitehead "has spent countless hours mentoring me in my professional growth.); Ex. A at 7 ("Mark served as my mentor, and his vast knowledge helped me achieve the success I enjoy today."); Ex. A at 12 (Mr. Whitehead is a "highly respected individual," who is "extremely knowledgeable" and "helpful," and serves as a source of "advice."); Ex. A at 10 ("I have relied on his wisdom and his experience but most all his friendship.").)

Mr. Whitehead is also described repeatedly as being a devoted husband and father.  (Ex. A at 6 (Mr. Whitehead's work ethic comes "mainly from his never-ending and unconditional love for his family."); Ex. A at 4 ("As a family man I have seen Mark be a dedicated and caring father to his two wonderful children and an outstanding husband to his wife of over 30 years."); Ex. A at 5 ("He is a loving [f]ather to his daughters and a devoted husband to his wife . . . ."); Ex. A at 18 ("His wife and daughter have been by his side throughout his incarceration and support him unconditionally.  I believe their unyielding love for him speaks to his character as a spouse and a parent.").)

These letters provide a broader view of Mr. Whitehead's character and background.  They show that he is someone who has worked hard, provided a good service to many clients, taken the time and energy to mentor others both in a professional and personal capacity, and has remained steadfastly devoted to his wife and daughters.  They show that Mr. Whitehead is not someone who needs to spend a prolonged period of time in prison for this offense.

**C.     Seriousness of the Offense, Respect for Law, Just Punishment**

As shown in Section V.G, the requested sentence is in line with other cases involving violations of court orders.  It is also relatively strict in light of Mr. Whitehead's criminal history and the nature of the offense.  The Sentencing Commission has recognized "the general appropriateness of imposing a sentence other than imprisonment in cases" like this one, "in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense."  28 U.S.C. § 994(j); *see also* USSG § 5K2.20(b).

**D.     Deterrence**

The requested sentence also affords adequate deterrence as required by 18 U.S.C § 3553(a)(2)(B).  Research has consistently shown that "certainty of punishment is more important than severity."  Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 30 (2006).  "[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects."  *Id.* at 28-29 (citations omitted); *see also* Andrew von Hirsch, *et al.*, *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999) ("[C]orrelations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance."); David Weisburd *et al.*, *Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*, 33 Criminology 587 (1995) (finding no difference in specific deterrence between probation and imprisonment for a sample of federal white collar offenders).

With regard to certainty of punishment, this Court has made it absolutely clear to Mr. Whitehead that his disobedience of court orders will be punished.  This message has rung loud and clear for Mr. Whitehead.  For someone like him, who has never spent a day in jail before this case, 5 months and 10 days in custody is more than sufficient to deter him and others who are similarly situated from future violations of court orders.  As Corey Parker sums up in his letter of support:

> This experience of being incarcerated at [Mr. Whitehead's] age [of 66
> years old] for the first time has been a trying experience.  I believe the

time he has spent in custody thus far has been eye opening and has served

the deterrent effect necessary for Mr. Whitehead to live the remainder of

his life as a law-abiding citizen.

(Ex. A at 18).  In addition to the usual hardships imposed by incarceration, Mr.

Whitehead has suffered from a medical issue with his eye while in custody.

**E.      Need to Protect the Public**

The requested sentence is also sufficient to protect the public.  18 U.S.C.

§ 3553(a)(2)(C).  There is absolutely no indication that Mr. Whitehead poses a physical

danger to the community.  With regard to economic danger, there is no evidence that he

has engaged in new misconduct or poses a continued danger to the community.  As

described in Section III, the Bankruptcy Court dismissed the argument that Mr.

Whitehead filed his bankruptcy in bad faith.

The statistics, moreover, show that individuals like Mr. Whitehead are at a low

risk of recidivism, and thus, pose a low risk to the public.  For individuals in Criminal

History Category I—the recidivism rate is 12.7% for those who have been employed,

9.8% for those who have been legally married, and 6.2% for those who are over 50

years old.  *See* U.S. Sentencing Commission, *Measuring Recidivism:  The Criminal

History Computation of the Federal Sentencing Guidelines*, at 28-29 (May 2004).  For

someone like Mr. Whitehead who has all three of these characteristics, the recidivism

rate is likely even lower.  What is more, Mr. Whitehead has zero criminal history

points.  Such individuals have half the recidivism rate of those with one criminal

history point.  *See* Sentencing Comm'n, *Recidivism and the "First Offender*," at 13-14

(May 2004).  Simply put, further incarceration is not needed to protect the public.

**F.      Rehabilitation**

Nor is further incarceration needed to provide Mr. Whitehead with "educational

or vocational training, medical care, or other correctional treatment."  18 U.S.C. §

3553(a)(2)(D).  He has already shown his amenability to rehabilitation.  He has no

other criminal offenses, and he took steps to remedy some of the alleged acts of

20

contempt before he was convicted.  He gave the Receiver permission to access Lions Gate, his lawyer turned over Tax Sux bank records to Mr. Okada's lawyers, and he took down the postings advertising Lions Gate after learning that they violated court orders. Mr. Whitehead does not need further incarceration to facilitate his rehabilitation.

## VII. CONCLUSION

For the foregoing reasons, Mr. Whitehead respectfully requests that the Court impose a sentence of time served (5 months and 10 days), followed by 1 year of supervised release.  In the alternative, if the Court seeks to impose additional punishment, Mr. Whitehead respectfully submits that further incarceration is unnecessary, and that a sentence of time served, followed by 4 months' home detention and 1 year of supervised release would restrict his liberty for an additional period and impress the seriousness of the offense on him.

Respectfully submitted,

HILARY POTASHNER
Federal Public Defender

DATED:  March 23, 2018             By  */s/ Isabel Bussarakum*

ISABEL BUSSARAKUM
Deputy Federal Public Defender
Attorney for MARK WHITEHEAD